UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES OF AMERICA                                                                    PLAINTIFF

v.                                        No. 2:22-cv-02063

$34,918 UNITED STATES CURRENCY                                                            DEFENDANT

CHRISTOPHER HESTER                                                                          CLAIMANT

**OPINION AND ORDER**

Before the Court is Plaintiff's Motion to Strike the Claim and Answer (Doc. 21) under Rule G(8)(c)(1)(A) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Federal Rules of Civil Procedure. Claimant has filed a response (Doc. 24). Plaintiff seeks to have Claimant's filings struck as a sanction for failure to respond to Plaintiff's Rule G(6) interrogatories. For the reasons stated below, Plaintiff's motion is GRANTED.

**I.  Background**

   a. Seizure of the Money

On November 2, 2021, Arkansas State Police Corporal Bernard Pettit pulled claimant Christopher Hester over for a traffic violation. (Doc. 2-1). Mr. Hester had been traveling westbound on Interstate 40 with one passenger, Antonio Burris. While collecting the men's identification, Corporal Pettit smelled marijuana in the car and conducted a probable cause search of the vehicle. In a backpack on the front passenger floorboard, Corporal Petit found $34,918, vacuum-sealed in plastic-wrapped bundles, in a plastic zip-lock bag. Also in the car were two empty suitcases. *Id.*

The United States (hereinafter "the Government") seeks forfeiture of the money under 21 U.S.C. § 881(a)(6). In its Complaint for Forfeiture (Doc. 2), the Government claimed the money

1

was subject to forfeiture as "1) money . . . intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; 2) proceeds traceable to such an exchange; or 3) money . . . intended to be used to facilitate a violation of the Controlled Substances Act." (Doc. 2, p. 2). In support of its complaint, the Government introduced the affidavit of DEA Special Agent Michael Brooks (Doc. 2-1). According to Agent Brooks, there were several indications that the money was destined to be used, or had already been used, in a drug transaction:

- Bulk quantities of drugs are often exchanged for bundles of currency in thousand- or multi-thousand-dollar increments in order to facilitate a quick count in a public area. (Doc. 2-1, ¶ 9).
- Packaging currency bundles in plastic serves three goals for drug trafficking organizations: it facilitates quick counting of the money during the exchange, it prevents police dogs from detecting drug proceeds, and it prevents the courier from stealing any proceeds. (Doc. 2-1, ¶¶ 10–11).
- A drug-sniffing dog, K-9 Rocco, "alerted" to the scent of the money. (Doc. 2-1, ¶¶ 19–21).
- Empty luggage is often brought to drug transactions so that the drugs can be packaged inside and transported in an inconspicuous manner. (Doc. 2-1, ¶ 30).

    b. <u>Legal Proceedings & Interrogatories</u>

During administrative forfeiture proceedings, Mr. Hester claimed ownership of the money, stating as follows: "It was in my possession at the time [it was seized]. I have saved that money for some time through my disability payments from the VA for my service with the Marine Corps. I have also received money from my girlfriend as loans and gifts to save this money." (Doc. 21-1, p. 4).

After the Government filed its Complaint for Forfeiture in this Court, Mr. Hester filed a verified answer (Doc. 10). He attributed the funds to "a lump sum for back pay," "a monthly check" for disability, and "money from his girlfriend, who had just received a lump sum payment from a former employer." (Doc. 10, pp. 1–2.)[1]

On June 3, 2022, the Government served Mr. Hester with a set of 17 interrogatories (Doc. 21-2) under Federal Rule of Civil Procedure Supplemental Rule G(6). The interrogatories were "to be answered under an oath within twenty-one (21) days of service." *Id.* at 1; *see* Fed. R. Civ. P. Supp. R. G(6)(b). However, the Government claims that Mr. Hester did not respond until 24 days later, on June 27. (Doc. 21, p. 3). In any event, the response was less than satisfactory: Mr. Hester objected to nine of the 17 interrogatories, provided incomplete responses to four, and failed entirely to respond to one. (Doc. 21, p. 3; *see generally* Doc. 21-3). Further, the responses were signed only by Mr. Hester's attorney and were not answered under oath. (Doc. 21-3, p. 7).

On June 27, counsel for the parties agreed that Mr. Hester would respond to all but one[2] of the objected-to questions by July 12 (Doc. 21-4). The Government noted that, under Federal Rule of Civil Procedure 33, the interrogatories needed to be made under oath and signed by the person answering. Mr. Hester's counsel confirmed, stating: "Yes, that is all correct. We will provide verification and supplemental answers to special interrogatories by July 12th." *Id.*

On July 12, Mr. Hester responded for the second time to the Government's interrogatories. (Doc. 21, p. 4). Mr. Hester also submitted documentation showing a Social Security payment he

---

[1] Mr. Hester also filed two other documents styled as "answers" (Docs. 13, 14) and a "Second Amended Answer" (Doc. 20), the last in response to a motion to compel (Doc. 19). All attribute the money to these sources.

[2] "Explain why the Defendant Currency was plastic-wrapped in bundles and placed in a vacuum-sealed bag." (Doc. 21-5).

received in 2016, a pay stub for his girlfriend Michelle Head in 2017, records of a severance payment made to Ms. Head in 2018, bank records for the couple's joint account between October 2018 and February 2022, and bank records for Mr. Hester's personal account between July 2019 and February 2022.  Mr. Hester also included a signed declaration.  *Id*.

While Mr. Hester answered all agreed-upon interrogatories, many of his answers were incomplete.  (*See generally* Doc. 21-5.)  For example, asked to "[i]dentify the states, provinces and foreign countries in which you have obtained a driver's license . . . including, where applicable, the license . . . number, and state whether the license . . . is currently valid," Mr. Hester simply responded "Virginia."  (Doc. 21-5, p. 2).  Asked for detailed information on the source of the funds, including payors and payees of any checks involved, the date such checks were cashed or deposited, the form and amount of any portion of the funds originally received in a form besides check or cash, and the names and contact information of any witnesses who could support his answer, Mr. Hester's entire response was "Transfer from bank to bank and cash deposits."  *Id.* at 3–4.

Underwhelmed, the Government contacted Mr. Hester on July 15, noting deficiencies in nine of his responses.  (Doc. 21-6).  It warned Mr. Hester that it would move to strike his claim if he did not respond completely by July 22.  *Id.* at 2.  The parties later extended the deadline to August 5.  (Doc. 21, pp. 4–5).  The Government indicated its willingness to accept incomplete or late responses if Mr. Hester was unable to respond within the time frame, provided that Mr. Hester's counsel identified the problem and stated when to expect the missing information.  (Doc. 21-6, p. 2).

On August 4, Mr. Hester's counsel sent the Government his client's supplemental responses.  (Doc. 21-6).  While these addressed most of the Government's concerns, Mr. Hester

refused to supplement his original responses to three of the interrogatories. (Doc. 21, p. 5). Specifically, the Government had requested: the time, date, place, manner, and any witnesses to Mr. Hester's acquisition of the currency; the form of, reason for, and any witnesses or documents confirming the original payment to Mr. Hester; and which of the deposits and withdrawals in Mr. Hester's bank records made up the sum of money seized during the traffic stop. (Doc. 21-6). Regarding the money's acquisition, Mr. Hester's counsel stated that "the information provided shows where the money comes from, where the money was transferred and sent to Mr. Hester. The relationship with the money has been firmly established. No other information will be provided." (Doc. 21-7, p. 1). Regarding confirmation of the original payment to Mr. Hester, counsel wrote: "Special Interrogatories are not standard discovery; this additional request goes past the scope of Special Interrogatories. The question was answered . . . and all bank deposits were included previously." And regarding the specific deposits and withdrawals, counsel wrote: "All deposit information for the money was sent to [the Government's] Counsel. The deposits [sic] statements for the past several years for which Mr. Hester was saving for his trip. Any additional request is outside the scope of the special interrogatories." *Id.* Hester did not sign the supplemented responses. *See id.*

    c. The Present Motion

On August 5, 2022, the Government filed a motion to strike (Doc. 21). It cites Mr. Hester's failure to provide complete responses after two months and multiple requests. *Id.* at 5. It also argues that the questions which Mr. Hester refused to answer were legally proper. *Id.* at 14–20. Therefore, it asserts, Mr. Hester's claim should be dismissed under Rule G(8)(c). *Id.* at 12.

After being granted extra time to respond (Doc. 23), Mr. Hester filed a response in opposition on September 1 (Doc. 24). Mr. Hester argues that his conduct does not warrant the

"extreme sanction" of striking his claim. (Doc. 24, p. 5.) He cites his "new and additional responses every time the Government has asked for them" and his "considerable effort" in gathering evidence. *Id.* He requests that this Court deem his answers satisfactory and allow him to begin his own discovery. *Id.* at 6. In the alternative, he requests more time to supplement his answers, citing the difficulties of "dealing with multiple bank accounts during the remnants of COVID when some facilities still have limiting policies on face-to-face visits and picking up items." *Id.*

Mr. Hester's response does not argue that the Government's interrogatories were improper or that his objections were proper. *See generally id.* Rather, it includes verified answers to the three special interrogatories he refused to supplement in the August 4 letter. *Id.* at 2–4, 7. These answers are significantly more detailed than Mr. Hester's previous answers. In them, Mr. Hester claims that he "would take varying amounts of money from each month and place them in a safe for savings," accumulating roughly $26,786 in cash this way. *Id.* at 2–3. Hester also claims to have received a $32,119 payment from Social Security, of which a "substantial amount" was placed in a safe for savings. *Id.* at 2. Hester claims that some, but not all, of this accumulated money was brought on the trip. *Id.* at 3. Hester's response also included five exhibits:

- A 2016 Form SSA-1099[3] showing $32,119 in benefits paid to Christopher William Hester (Doc. 24-1). Of that, $27,045 is listed as having been paid by check or direct deposit, with the balance attributable to Medicare benefits and Treasury offsets. $20,385 of the total was back pay: $11,736 paid in 2016 for 2015 and $8,649 paid in 2016 for 2014.

---

[3] An SSA-1099 is a tax form mailed annually to Social Security recipients. It shows the total amount of benefits paid to the recipient during the previous year. *Frequently Asked Questions*, SOCIAL SECURITY ADMINISTRATION (July 28, 2022), https://faq.ssa.gov/en-us/Topic/article/KA-01723.

- Two pieces of correspondence: A benefits summary from the Department of Veterans Affairs stating a monthly award amount of $1,288.03 for Christopher Hester as of January 2022, and a benefit verification letter from the Social Security Administration stating that Christopher W Hester's monthly Social Security benefit was $1,121 beginning in December 2021 (Doc. 24-2).

- Banking records for Christopher William Hester dating from July 2019 to February 2022 (Docs. 24-3, 24-4) and for Ms. Head and Mr. Hester's joint account dating from November 2018 to February 2022 (Docs. 24-5, 24-6). On Mr. Hester's records, all transfers to an account in Ms. Head's name[4] and all cash withdrawals (including at ATMs) are marked with stars drawn in the margin. In the joint account's records, all cash withdrawals are similarly marked. The marked transactions total $19,668 in Mr. Hester's records and $7,118 in the joint account records. This is apparently the $26,786 that Mr. Hester claims to have withdrawn and put in his safe.

- A document indicating an unidentified "benefit" paid to Michelle Head (Doc. 24-7) in the amount of $37,649.24 after taxes. The document is not dated, but Mr. Hester claims that Ms. Head received it on April 2, 2018. (Doc. 24, p. 3).

- An affidavit (Doc. 24-8) signed by Michelle Head, in which she declares that she gave Mr. Hester $16,000 of "a large payment from my former employer, roughly $37,000" so that "he could have a great time on his trip."

In its reply to Mr. Hester's response (Doc. 25), the Government takes issue with Mr. Hester's new answers. Specifically, it points out that some of the cash withdrawals alleged to have made up the seized currency were made after the currency was seized and that there is no indication

---

[4] It is unclear whether this is the couple's joint account or a separate one.

the transfers to the Michelle Head account were ever deposited in the safe. *Id.* at 2. It asserts that Mr. Hester's exhibits provide no indication of where Mr. Hester's Social Security back payments or Ms. Head's severance payment were initially deposited, as requested in the interrogatory. *Id.* at 5. Finally, it notes that if the lump sums were ever deposited in the accounts for which records were provided, they had been almost entirely drawn down by the date of the earliest statements produced.[5] *Id.* at 6.

## II.   Analysis

Civil forfeiture proceedings are governed by Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Federal Rules of Civil Procedure. Under Rule G, a person who asserts an interest in the defendant property may file a claim in the court where the forfeiture action is pending. Fed. R. Civ. P. Supp. R. G(5)(a)(1). The claim must state the specific property claimed, the claimant and the claimant's interest in the property, and be signed under penalty of perjury. Fed. R. Civ. P. Supp. R. G(5)(a)(1)(A)-(C). This is not a demanding standard. The Eighth Circuit recently held that a claimant states a sufficient interest in the defendant property simply by claiming to be "the owner." *United States v. $579,475.00 in U.S. Currency*, 917 F.3d 1047, 1049 (8th Cir. 2019).

In order to weed out unsubstantiated claims, Supplemental Rule G(6) permits the government to inquire further into a claimant's interest in the property. Specifically, "[t]he government may serve special interrogatories limited to the claimant's identity and relationship to the defendant property without the court's leave at any time after the claim is filed and before discovery is closed." Fed. R. Civ. P. Supp. R. G(6)(a). Answers or objections must be served

---

[5] Specifically, the balance of Mr. Hester's account was $54.58 on July 1, 2019, the date of the first record. (Doc. 24-3, p. 3). The joint account was opened on October 10, 2018, with a $50 deposit. (Doc 24-5, p. 4).

within 21 days after service of the interrogatories.  Fed. R. Civ. P. Supp. R. G(6)(b).  The government may move to strike a claim for failure to comply with Supplemental Rule G(6).  Fed. R. Civ. P. Supp. R. G(8)(c)(i)(A).

The Eighth Circuit's decision in *United States v. $284,950.00 in U.S. Currency*, 933 F.3d 971 (8th Cir. 2019), illustrates the operation of Rule G.  In that case, TSA agents at the Little Rock, Arkansas, airport found and seized $284,950 in the false bottom of Nikkolas Thompson's suitcase. *Id.* at 972.  Thompson filed a verified claim and answer contesting the government's action, claiming that the money belonged to him and to his business. *Id.* at 972–73.  The government served Thompson with interrogatories under Supplemental Rule G(6), but Thompson's answers were deficient and he refused to supplement them. *Id.* at 973.  The government moved to strike Thompson's claim for failure to comply with Supplemental Rules G(5) and G(6). *Id.*  The trial court found that Thompson had complied with Supplemental Rule G(5) but ordered him to supplement his responses within 21 days. *Id.*  After multiple extensions of time, Thompson still produced only incomplete responses, and the government moved to strike his claim again. *Id.* Thompson argued that the interrogatories were overly burdensome and sought a protective order. *Id.* at 973–74.  The trial court denied Thompson's motion and struck his claim as a discovery sanction under Federal Rule of Civil Procedure 37. *Id.* at 974.

On appeal, the Eighth Circuit held that the trial court had not abused its discretion in striking Thompson's claim. *Id.* at 975.  While it noted that striking a claim is an extreme sanction under the Federal Rules of Civil Procedure, it pointed out that "the special role that [special interrogatories] play[ ] in the scheme for determining claim standing may justify a somewhat more demanding approach" than that used in ordinary civil discovery. *Id.* at 974 (quoting Fed. R. Civ. P. Supp. R. G advisory committee's note to 2006 adaptation).  The Eighth Circuit held that

9

Thompson's failure to verify his supplemental answers, failure to supplement a response to one interrogatory, failure to identify documents as requested, confusing accounts of who owned the money, and failure to submit documents linking the money to his financial history violated the trial court's order. *Id.* at 975. Therefore, the Eighth Circuit affirmed the trial court. *Id.*

The similarities between *$284,950* and the present case are striking. Like Thompson, Mr. Hester claims ownership of a large amount of currency. Despite multiple extensions of the relevant deadlines, Mr. Hester has provided incomplete answers to the Government's questions. Even the detailed answers incorporated into Mr. Hester's response to the instant motion are either incomplete or raise "significant questions about his standing. For example, though he provided some bank and tax documents, they do not explain his possession of so much currency, and he has failed to provide these documents with any context that would allow the Government to connect the currency with his financial history." The quoted language is from *$284,950*, 933 F.3d at 975, but applies equally here.

In the present case, for "the defendant currency or any portion thereof," the Government has requested "the payor and payee of the check(s), the amount thereof, the approximate date the check was written, [and] the date and place where the check was cashed or deposited." (Doc. 24, p. 4). Further, for relevant deposits into bank accounts to which Mr. Hester "had control and/or access," Mr. Hester needed to provide a banking institution and account number, identify the corresponding deposit and withdrawal, and give the date and amount. *Id.* As to the Social Security back payment received in 2016, Mr. Hester has provided no contemporary bank records, check information, or any other indication of what happened to the money once it reached Mr. Hester's hands. Little, if any, of this money was in Mr. Hester's personal checking account for the period he claims to have made withdrawals; at the beginning of that period, Mr. Hester's account balance

was less than $60. Therefore, Mr. Hester has failed to provide the requested information regarding the Social Security lump sum.

Mr. Hester argues that the cash withdrawals he has put in evidence, combined with the sum he alleges that Ms. Head gave him, more than account for the money at issue. (Doc. 24, p. 5). This is beside the point. Mr. Hester's claim states that "[h]e received a lump sum payment for back pay and receives a monthly check that in part explains the money in Mr. Hester's possession." (Doc. 10, p. 1). Therefore, the lump sum payment allegedly contributed "a portion . . . of" the currency at issue. As such, it fell within the scope of the interrogatory, which Mr. Hester was bound to answer under Supplemental Rule G(6)(b).

Even if the Court were to excuse the lack of documentation for the Social Security payment, the fact remains that Mr. Hester has also not disclosed the necessary information for Ms. Head's severance payment. He has provided a document indicating that Ms. Head received such a payment, an affidavit from Ms. Head stating that she gave him $16,000, and a verified interrogatory answer stating that she "gave money to Mr. Hester in different amounts totaling up to roughly $16,000 over the past couple of years" and that these "payments were in cash or check." (Doc. 24, pp. 3–4). However, no information about any such checks has been provided. Insofar as they were deposited into Mr. Hester's account or the joint account, the portions withdrawn as cash have been designated by Mr. Hester as his own contribution to the funds. Therefore, Mr. Hester has failed to provide the requested information as to the portions of the $16,000 Ms. Head gave him in check form.

Mr. Hester argues that striking his claim is not warranted. (Doc. 24, p. 5). He says that "[s]triking a claim is an extreme sanction that should be applied only when there is an order compelling discovery, a willful violation of that order, and prejudice to the other party." *United*

*States v. $11,071,188.64 in U.S. Currency*, 825 F.3d 365, 369 (8th Cir. 2016) (internal quotations omitted). Mr. Hester further asserts that "[t]here has been no order compelling discovery, no willful violation of that order, and certainly no prejudice to the government." (Doc. 24, p. 6). But Mr. Hester quotes the standard for striking a claim under Federal Rule of Civil Procedure 37. The advisory committee notes to Supplemental Rule G(8) state that the importance of Rule G(6) in civil forfeiture "may justify a somewhat more demanding approach than . . . Rule 37." Therefore, conduct falling short of the Rule 37 standard may still warrant striking a claim under Supplemental Rule G(8). Here, while there is no discovery order, Mr. Hester engaged in conduct highly similar to the claimant's conduct in *$284,950*, which was held to be a willful violation of Supplemental Rule G(6). Further, the long delay and inadequate response have prejudiced the Government's ability to contest Mr. Hester's claim. Accordingly, the Court finds that Mr. Hester's claim may be stricken under Supplemental Rule G(8).

Finally, Mr. Hester asks that, in lieu of striking his claim, the Court order him to supplement his answers within a "reasonable time frame, considering" the labor-intensive task of going through years of financial records and the obstacles posed by the COVID policies of the financial institutions involved. (Doc. 24, p. 6.) The Court declines to do so. Mr. Hester was served with the Government's interrogatories over three months ago. In that time, he has been able to produce a wide array of financial records, some dating back five years or more. It is unclear to the Court what records Mr. Hester could find within a "reasonable time frame" that he has not yet had the means and opportunity to locate. To the extent that specific obstacles exist to the production of specific records, Mr. Hester should have notified the Court in his reply to the motion to strike.[6]

---

[6] Ideally, of course, Mr. Hester would have accepted the Government's invitation (Doc. 21-6, p. 2) to notify it of any difficulties in responding completely to an interrogatory.

The Court could then have considered such difficulties in determining whether Mr. Hester's violation of Supplemental Rule G(6) was willful. Absent any justification in the record for delay, the Court finds that allowing Mr. Hester to supplement his answers would be inappropriate.

IT IS THEREFORE ORDERED that the Government's motion (Doc. 21) to strike is GRANTED. Mr. Hester's Claim and Answer are hereby stricken.

IT IS SO ORDERED this 19th day of September, 2022.

/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE